UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>DANIEL V.T. CATENACCI | CASE NO. 1:21-CR-00759<br><br>HON. JORGE L. ALONSO |

**DEFENDANT'S MOTION FOR LEAVE TO ENTER GUILTY PLEA
PURSUANT TO *NORTH CAROLINA V. ALFORD***

Defendant Daniel V.T. Catenacci, by and through his attorneys, Ronald S. Safer, Jacob L. Kahn, and Georgia N. Alexakis, respectfully seeks leave to withdraw his plea of not guilty to the sole charge against him and to enter a plea of guilty while maintaining his innocence, pursuant to *North Carolina v. Alford*, 400 U.S. 25 (1970).

This Court can—and should—exercise its discretion and accept such a plea from Dr. Catenacci. As detailed below, (1) a strong factual basis would underlie Dr. Catenacci's *Alford* plea; and (2) the ends of justice would be served by permitting Dr. Catenacci to plead in this manner.

**FACTUAL BACKGROUND**

**I. Procedural History**

On December 16, 2021, the government charged Dr. Catenacci by information with one count of insider trading, in violation of 15 U.S.C. § 78j(b) and 78ff(a), and 17 C.F.R. § 240.10b-5. Dkt. No. 1. On January 4, 2022, Dr. Catenacci entered a plea of not guilty to this charge. Dkt. No. 7. On January 19, 2022, Dr. Catenacci appeared before this Court for the first time. Dkt. No. 12.

Although the judicial proceedings in this matter have been limited to date, Dr. Catenacci's interactions with the government have been anything but. Well before the government brought its

charge against him, Dr. Catenacci voluntarily submitted to lengthy interviews with the FBI and the U.S. Attorney's Office and had the opportunity to review extensive discovery in this matter.

**II.    The Uncontested Facts Established by the Government's Evidence**

The government's evidence in this matter is robust. More specifically, the government's evidence establishes the following facts.

**A.    Dr. Catenacci's Work**

Dr. Catenacci was a gastrointestinal medical oncologist, an associate professor of medicine, and the director of the gastrointestinal oncology program at the University of Chicago. Dr. Catenacci also served as a lead physician and primary field investigator on a clinical trial of an experimental drug for gastric/gastroesophageal cancer sponsored by a company known as Five Prime Therapeutics, Inc. ("Five Prime").

Five Prime is a clinical-stage biotechnology company based in South San Francisco, California. Five Prime's stock was publicly traded on the NASDAQ, a global electronic exchange for purchasing and trading securities.

**B.    Dr. Catenacci's Agreements With Five Prime**

Five Prime entered into certain written agreements with Dr. Catenacci, and the University of Chicago, to engage them to oversee, direct, and conduct a clinical trial of Five Prime's experimental cancer drug at the University of Chicago, one of many different sites for the clinical trial. Those written agreements allowed them to receive confidential information, such as Five Prime's clinical results, while simultaneously obligating them to hold such information in strict confidence and to use it solely for purposes of carrying out their contractual obligations. The agreements also included language indicating that the University of Chicago had in place procedures to prevent its employees and representatives, including Dr. Catenacci, from trading

-2-

shares of Five Prime stock while in possession of material non-public information that it received from Five Prime. Dr. Catenacci's signature appears on those agreements.

By contract, Dr. Catenacci owed a fiduciary duty to maintain the confidentiality of any material non-public information that he acquired by virtue of his position with Five Prime.

C.   **Five Prime's Public Announcement**

In or about November 2020, Five Prime made plans to publicly announce that the clinical drug trial on which Dr. Catenacci served as a primary field investigator had shown positive, initial results in treating advanced gastric/gastroesophageal cancer. Five Prime planned to announce the positive results from phase two of this clinical trial after 3:30 pm (CST) on November 10, 2020.

On the night of November 9, 2020, the night before the public announcement, Five Prime's Senior Director of Clinical Development sent Dr. Catenacci an email with an abstract (summary) of the phase-two clinical trial results. The Five Prime employee commented on the abstract, writing that "[w]e are quite excited about the results."

That same night, November 9, 2020, Five Prime's Chief Medical Officer sent Dr. Catenacci a separate email. This email stated that the interim results of the clinical trial and the underlying data constituted "material non-public information" of Five Prime; that U.S. securities laws prohibited "you" (Dr. Catenacci) from trading on the basis of such information; and that after Five Prime issued its press release, a copy of it would be sent to Dr. Catenacci and he would then know what information Five Prime was and was not publicly releasing.

Dr. Catenacci opened the two aforementioned emails early the following morning, November 10, 2020. In response to the email from Five Prime's Senior Director of Clinical Development, Dr. Catenacci wrote: "I am pleasantly surprised and cautiously optimistic." In response to Five Prime's Chief Medical Officer, Dr. Catenacci referenced his earlier response to

Five Prime's Senior Director of Clinical Development, writing: "Data looks great overall. I look forward to speaking at 8:30 a.m."

Later that same morning, at approximately 8:30 a.m. (CST), Dr. Catenacci joined a video conference call with Five Prime's Senior Director of Clinical Development to review the phase-two clinical data and results in more detail.

After the close of trading on November 10, 2020, Five Prime issued its press release announcing the positive results of phase two of its clinical drug trial. In connection with its public announcement, Five Prime conducted a live audio webcast and conference call.

### D. Dr. Catenacci's Trades

Dr. Catenacci held an IRA account with a global financial services firm, which enabled him to buy and sell securities of publicly traded companies on the firm's internet-accessible trading platform.

Before November 10, 2020, Dr. Catenacci was not a Five Prime shareholder. On November 10, 2020, at approximately 8:42 a.m. (CST), before Five Prime publicly announced the positive results from phase two of its clinical drug trial, Dr. Catenacci became a Five Prime shareholder when he began acquiring shares of Five Prime's stock on the NASDAQ through his personal brokerage account. By about 8:44 a.m., defendant had acquired 8,743 shares of Five Prime's stock.

On November 11, 2020, the first day of trading after Five Prime's public announcement, the price of Five Prime's stock increased by more than 300%. Shortly after the open of trading on the NASDAQ, at about 8:36 a.m. (CST), Dr. Catenacci began selling the stock that he had purchased the day before. By about 10:10 a.m. (CST) on November 11, 2020, Dr. Catenacci had sold his entire position in Five Prime's stock, thereby generating a net profit of approximately $134,142.

**III.     The Government's Evidence Regarding Dr. Catenacci's Mental State**

To prove a criminal violation of the insider-trading laws, the government must establish that Dr. Catenacci acted knowingly and willfully in trading Five Prime's stock on the basis of material, non-public information. *See United States v. Evans*, 486 F.3d 315, 323 (7th Cir. 2007); *United States v. Cassese*, 428 F.3d 92, 98 (2d Cir. 2005). More specifically, the government must show that Dr. Catenacci purchased Five Prime's stock with knowledge that (1) he was then possessing, misappropriating, and misusing inside information that he had obtained solely because he served as a primary field investigator on Five Prime's clinical drug trial; (2) he owed a fiduciary duty not to misuse inside information and to maintain its confidentiality before Five Prime's public announcement; and (3) he was violating this duty and, thus, the federal securities laws, by engaging in the trading for his own personal financial gain. *See Cassese*, 428 F.3d at 98.

Dr. Catenacci recognizes that the government has amassed sufficient evidence from which a jury could find beyond a reasonable doubt that he acted with the requisite mental state. He acknowledges the persuasive nature of the timeline and documents outlined above—and, in particular, the email sent on November 9, 2020, warning him not to trade using the "material non-public information" then in his possession. He understands that a jury presented with this evidence would have a ready avenue for returning a conviction against him.

This weighty admission notwithstanding, Dr. Catenacci maintains his innocence. Although he undoubtedly received the November 9, 2020, email from Five Prime's Chief Medical Officer conveying the prohibited nature of insider trading, Dr. Catenacci failed to read and retain that warning. Instead, when he reviewed the emails concerning Five Prime's interim phase-two clinical results on the morning of November 10, 2020, he was focused on just that—the early, but encouraging, signs of scientific and medical success.

### IV. The SEC's Complaint and Judgment Against Dr. Catenacci

In addition to this pending criminal matter, Dr. Catenacci has been the subject of a separate enforcement action by the Securities and Exchange Commission ("SEC") for the same conduct outlined above.

On December 17, 2021, just one day after the U.S. Attorney's Office filed its Information against Dr. Catenacci, the SEC filed a complaint alleging that Dr. Catenacci engaged in insider trading when he used Five Prime's material non-public information to purchase company stock in advance of its public announcement regarding its phase-two clinical trial results. *See* Complaint, *U.S. Sec. and Exch. Comm'n v. Catenacci*, Case No. 21 CV 06718 (N.D. Ill. Dec. 17, 2021), ECF No. 1. The complaint further alleged that Dr. Catenacci acted at least recklessly when he engaged in this insider trading. *Id.* at ¶¶ 14, 22-23.

That same day, Dr. Catenacci consented to the entry of a partial judgment against him in the SEC's action. *See* Agreed Motion for Entry of Judgment Against Defendant Daniel V.T. Catenacci, *SEC v. Catenacci*, Case No. 21 CV 06718 (N.D. Ill. Dec. 17, 2021), ECF No. 4. The SEC explained the parties' mutual desire to proceed in this manner in its agreed-upon motion seeking entry of a partial judgment against Dr. Catenacci:

> Defendant Catenacci does not wish to engage in extensive discovery proceedings and contest the SEC's claims at trial, and he has a strong interest in minimizing the financial consequences of the SEC's claims to the extent permitted by law. The SEC wants to obtain appropriate judicial relief against Defendant Catenacci, without unwarranted delay and use of resources.

*Id.* at 2.

On December 27, 2021, District Judge Mary M. Rowland entered the agreed-upon partial judgment in the SEC's action against Dr. Catenacci. Judgment as to Defendant Daniel V.T. Catenacci, *SEC v. Catenacci*, Case No. 21 CV 06718 (N.D. Ill. Dec. 27, 2021), ECF No. 11.

**ARGUMENT**

**I.      The Supreme Court Has Sanctioned *Alford* Pleas as a Constitutionally Permissible Means by Which a Defendant May Plead Guilty While Maintaining His Innocence.**

Guilty pleas are a favorable means to resolve criminal prosecutions because of the "mutuality of advantages" that they present to both sides. *Brady v. United States*, 397 U.S. 742, 752 (1970). "For a defendant who sees slight possibility of acquittal, the advantages of pleading guilty and limiting the probable penalty are obvious—his exposure is reduced, the correctional process can begin immediately, and the practical burdens of a trial are eliminated." *Id.* For prosecutors, a guilty plea often means a "more promptly imposed punishment" that "may more effectively attain the objectives of punishment." *Id.* Moreover, "with the avoidance of trial, scarce judicial and prosecutorial resources are conserved for those cases in which there is a substantial issue of the defendant's guilt or in which there is substantial doubt that the State can sustain its burden of proof." *Id*.

Under Federal Rule of Criminal Procedure 11, "[a] defendant may plead not guilty, guilty, or (with the court's consent) *nolo contendere*." Fed. R. Crim. P. 11(a)(1). The Supreme Court has defined the plea of *nolo contendere* as "a plea by which a defendant does not expressly admit his guilt, but nonetheless waives his right to trial and authorizes the court for purposes of the case to treat him as if he were guilty." *United States v. Gratton*, 525 F.2d 1161, 1163 (7th Cir. 1975) (citing *North Carolina v. Alford*, 400 U.S. 25, 35 (1970)).

*Nolo contendere* pleas are permissible resolutions to a criminal matter, the Supreme Court has explained, because "an express admission of guilt . . . is not a constitutional requisite to the imposition of a criminal penalty." *Alford*, 400 U.S. at 37. Rather, "[a]n individual accused of crime may voluntarily, knowingly, and understandingly consent to the imposition of a prison sentence even if he is unwilling or unable to admit his participation in the acts constituting the crime." *Id.*

*See also Overstreet v. Wilson*, 686 F.3d 404, 407 (7th Cir. 2012) ("The due process clause permits judges to accept guilty pleas from defendants who do not admit the factual basis of the charge against them, when the judge nonetheless has an adequate basis for finding that the defendant committed the crime.").

In *Alford,* 400 U.S. at 37, the Supreme Court further recognized that there is no "material difference between a plea that refuses to admit commission of the criminal act" (the *nolo contendere* plea) and "a plea containing a protestation of innocence" (what came to be known as the "*Alford* plea"). There, the state of North Carolina "had a strong case of first-degree murder against [defendant] Alford." *Id.* Yet Alford refused to admit that he committed this crime, and also maintained his innocence overall. *Id.* Ultimately, he insisted on pleading guilty to second-degree murder, rather than go to trial for first-degree murder, "because in his view he had absolutely nothing to gain by a trial and much to gain by pleading." *Id*. Alford recognized there was overwhelming evidence against him, and a guilty plea to the second-degree murder charge limited his maximum penalty to a 30-year term of imprisonment. *Id.* In these circumstances—where there was a "strong factual basis for the plea demonstrated by the State and Alford's clearly expressed desire to enter it despite his professed belief in his innocence"—the Supreme Court held that the trial judge did not commit constitutional error in accepting the defendant's guilty plea. *Id.* at 38; *see also* Fed. R. Crim. P. 11(b)(3) ("Before entering judgment on a guilty plea, the court must determine that there is a factual basis for the plea.").

Federal appellate courts around the country, including the Seventh Circuit, have repeatedly recognized the validity of an *Alford* plea. For example, in *United States v. Bey*, 748 F.3d 774, 775 (7th Cir. 2014), the Seventh Circuit described an *Alford* plea as "a plea of guilty by a defendant who maintains his innocence, but, perhaps thinking that if he goes to trial he'll be found guilty

(and not be able to get the judgment overturned on appeal), because there's a mountain of evidence against him, pleads guilty in hopes of obtaining a lighter sentence." *Id*. The defendant in that case entered an *Alford* plea to a bank robbery charge, which was accepted by the district court. *Id.* at 775. The Seventh Circuit deemed challenges to *Bey's* sentence to be frivolous and dismissed the appeal. *Id.* at 776-79. Nevertheless, the *Alford* plea stood as valid. *Id.*; *see also Hicks v. Hepp*, 871 F.3d 513, 520 (7th Cir. 2017) (observing a defendant's *Alford* plea without disturbing it); *United States v. Morrow*, 914 F.2d 608, 611-613 (4th Cir. 1990) (holding that the district judge did not abuse his discretion in accepting defendant's *Alford* plea); *United States v. Mackins*, 218 F.3d 263, 268-69 (3d Cir. 2000) (recognizing validity of defendant's *Alford* plea).

## II.  District Courts Enjoy Broad Discretion in Accepting *Alford* Pleas.

To be sure, courts are not required to accept a defendant's guilty plea simply because a defendant wishes to proceed in that manner, and the same is true with *Alford* pleas. *Alford*, 400 U.S. at 38. But just as with any guilty plea, district courts enjoy broad discretion to accept pleas entered pursuant to *Alford*. *See, e.g.*, *Morrow*, 914 F.2d at 611 (holding that "[a]cceptance of such pleas is within the discretion of the trial judge" and that such discretion is "wide").[1]

In *United States v. Davis*, 516 F.2d 574, 578 (7th Cir. 1975), the Seventh Circuit affirmed a district court's exercise of discretion in accepting an *Alford* plea, where the district court had before it the same two factors present in *Alford*: "strong evidence of guilt" and a defendant who "with an understanding of the charge and the consequences of his plea and with the advice of

---

[1] There are several examples where district courts within the Seventh Circuit have exercised their discretion to accept *Alford* pleas and, in at least certain cases, have done so over the government's objection. *See*, *e.g.*, Order, *United States v. Daoud*, Case No. 1:12-cr-00723 (N.D. Ill. Nov. 16, 2018), ECF Nos. 297, 299; Minute Entry, *United States v. Block*, Case No. 1:08-cr-00900 (N.D. Ill. May 9, 2013), ECF No. 110; Minute Entry, *United States v. Bey*, Case No. 1:11-cr-00107 (N.D. Ill. Oct. 4, 2012), ECF Nos. 133, 136; Minute Entry, *United States v. Abdallah, et al.*, Case No. 1:03-cr-00583 (N.D. Ill. Oct. 22, 2003), ECF No. 40.

competent counsel, wants to plead guilty." Other federal appeals courts likewise have concluded that "[a] trial court may accept an *Alford* plea" under the same two circumstances: "(1) the defendant intelligently concludes that his interests require entry of a guilty plea; and (2) the record before the judge contains strong evidence of actual guilt." *United States v. King*, 673 F.3d 274, 281 (4th Cir. 2012) (quotation marks omitted); *see also Willett v. State of Ga.*, 608 F.2d 538, 540 (5th Cir. 1979) (holding that when a trial court is presented with a proposed *Alford* plea, requiring a "judicial finding of some factual basis for [the] defendant's guilt is an essential part of the constitutionally-required finding of a voluntary and intelligent decision to plead guilty"); *Morrow*, 914 F.2d at 612 (refusing to "place more requirements" on *Alford* pleas beyond the "factual basis" requirement that exists for "any Rule 11 proceeding").[2]

### III. This Court Should Accept Dr. Catenacci's *Alford* Plea Because the Record Contains Strong Evidence of Guilt and Dr. Catenacci's Decision to Proceed in This Manner is Knowing and Voluntary.

The government's case against Dr. Catenacci is undeniably strong. Civil liability for insider trading exists where a person "obtains (a) material, (b) nonpublic information intended to be used solely for a proper purpose, and then (c) misappropriates or otherwise misuses that information (d) with scienter, (e) in breach of a fiduciary duty, or other duty arising out of a relationship of trust and confidence, to make secret profits." *U.S. Sec. and Exch. Comm'n v. All Know Holdings, Ltd.*, 949 F. Supp. 2d 814, 817 (N.D. Ill. 2013) (quotation marks omitted). To prove the single-count Information in this case, the government must prove all of the above elements, and must further prove that Dr. Catenacci acted "willfully." *See Evans*, 486 F.3d at 323. As discussed above, that

---

[2] Other courts have articulated additional factors to consider in the context of *nolo contendere* pleas, including "any mitigating circumstances, the culpability of the defendant (tendering a nolo plea) relative to codefendants, the deterrent effect of a nolo as compared to a guilty plea, the pragmatic considerations of avoiding an expensive and time-consuming trial, and similar factors." *See United States v. Brighton Bldg. & Maint. Co.*, 431 F. Supp. 1118, 1119 (N.D. Ill. 1977) (quotation omitted).

means that Dr. Catenacci must have acted with knowledge that his conduct violated the federal securities laws. *See supra* at 4-5.

Here, Dr, Catenacci does not dispute that he bought Five Prime stock while he possessed material, non-public information. Nor does he dispute that he signed an agreement that included a clause against insider trading or that he received an email warning him not to trade on the night before he bought Five Prime stock. Dr. Catenacci concedes that this is all compelling evidence upon which a jury could find him guilty. Thus, there is an adequate factual basis for the Court to accept a plea. *See* Fed. R. Crim. P. 11(b)(3).

What Dr. Catenacci cannot admit, however, is that he acted willfully. He did not intentionally trade for the purpose of defrauding or deceiving anyone. Dr. Catenacci has consistently maintained—since his initial discussions with the FBI—that he did not read the specific provisions in the agreements he signed related to securities trading and that he failed to read the body of the warning email he received the night before he bought the stock. He understood generally that he was not to communicate the information he received to others. But he did not understand that the federal securities laws prohibited him from trading on the basis of the information he had received. He recognizes now, in hindsight, that he should have read the documents and the warnings that he received more closely. And he also understands now, in hindsight, that it is not only improper for persons in possession of material non-public information to communicate that information to others (including others who might trade on the basis of that information), but that it is a violation of the federal securities laws for such a person to make trades on his own behalf. As applied to this case, Dr. Catenacci simply failed to appreciate that because he possessed material non-public information concerning Five Prime, it would be wrong for him to buy stock in Five Prime.

While the government's evidence regarding Dr. Catenacci's statement of mind will be entirely circumstantial, it nonetheless is sufficient to establish a factual basis for his proposed *Alford* plea under Rule 11. Indeed, Dr. Catenacci recognizes that the circumstantial evidence of his mental state could lead a jury to conclude that he in fact had the requisite mental state—even though he did not have it. Dr. Catenacci's inability to admit that he knowingly violated the federal securities laws, however, is not an impediment to his plea. *Davis*, 516 F.2d at 577 ("An acknowledgment of the truth of all the facts essential to guilt was not, however, necessary to satisfy the factual-basis requirement of Rule 11."). Moreover, his assertion that he did not act with the requisite *mens rea* does not detract from the strength of the government's circumstantial evidence on that point.

Dr. Catenacci understands what it would mean for him to enter an *Alford* plea to the charge set forth in the Information and seeks the Court's permission to do so fully cognizant that, if permission is granted, the result would be the same as if he were convicted following a jury trial. Dr. Catenacci has been living with the government's investigation and this prosecution for nearly six months. Immediately upon being informed of the investigation, Dr. Catenacci retained experienced criminal defense counsel. Dr. Catenacci has had an opportunity to review the discovery produced by the government and to discuss that discovery with his counsel. He further has had ample time to consider his options in this case, including through discussions with his counsel. Having weighed his options in full, Dr. Catenacci wishes to proceed with an *Alford* plea, with the Court's consent.

**IV.** **The Interests of Justice Would Be Served Were This Court to Permit Defendant to Proceed Via an *Alford* Plea.**

Allowing Dr. Catenacci to proceed via an *Alford* plea would satisfy the interests of justice, including the interests of the public. *See United States v. Bednarski*, 445 F.2d 364, 366 (1st Cir.

1971) (considering the interests of the public in deciding whether it was appropriate to resolve a criminal proceeding with an *Alford* plea).

First, both parties here—as well as the Court—would benefit from Dr. Catenacci's proposed resolution to this criminal matter. By proceeding via an *Alford* plea, Dr. Catenacci would be able to move toward sentencing more promptly, satisfy whatever penalty this Court chooses to impose, and make any additional and necessary amends—all the while sparing his young family the stress and difficulties of a trial that will likely gather significant media attention and where the outcome appears to be all but assured.[3] The government, in turn, will benefit by quickly obtaining a felony conviction based on a record showcasing strong evidence of guilt. And this Court will be able to conserve valuable judicial resources that might otherwise be consumed by a jury trial, at a time when judicial resources are even scarcer than usual.

Second, the public interest will be served by allowing Dr. Catenacci to proceed via an *Alford* plea. The public certainly has an interest in the prompt and efficient resolution of justice, which an *Alford* plea would help expedite. Furthermore, Dr. Catenacci would still be convicted of a felony even if his *Alford* plea is accepted, and he would, of course, still serve whatever sentence this Court elects to impose. He would also still face the collateral consequences associated with that conviction, including continued scrutiny by the public (*see* note 3, *supra*) and the potential

---

[3] Local, national, and industry-specific publications promptly reported the criminal charges and SEC complaint filed against Dr. Catenacci. *See, e.g.*, Jason Meisner, *Feds: Top U. of C. doctor used insider knowledge of cancer drug to make stock market windfall*, CHI. TRIB. (Dec. 20, 2021, 11:00 a.m.), https://www.chicagotribune.com/news/criminal-justice/ct-university-of-chicago-doctor-insider-trading-charges-20211220-vxpdqgzjbrdvpdyd7iqpzvguxi-story.html; Matt Levine, *There's Inside Information in SEC Filings; Also Web3, drug-trial insider trading and Olive Garden NFTs*, BLOOMBERG (Dec. 21, 2021, 5:25 p.m. UTC), https://www.bloomberg.com/opinion/articles/2021-12-21/there-s-inside-information-in-sec-filings; Alice Tracey, *UChicago oncologist settles SEC charges, pleads not guilty to criminal insider trading*, The Cancer Letter, Vol. 48 No. 1 (Jan. 7, 2022), https://cancerletter.com/the-cancer-letter/20220107_3/.

impact on his ability to pursue his passion for cancer treatment both through research and patient care as a practicing physician.

Finally, in addition to any criminal penalties, Dr. Catenacci has already been permanently enjoined from violating the federal securities laws through the judgment to which he consented in the SEC's action. *See supra* at 6. He also faces the possibility of a civil monetary penalty in the SEC matter. *See* Judgment at 2, *SEC v. Catenacci*, No. 21 CV 06718 (N.D. Ill. Dec. 27, 2021), ECF No. 11.

In short, there is no doubt that justice, including specific deterrence, would be achieved in this matter, even if this Court were to permit Dr. Catenacci to proceed via *Alford* plea, where Dr. Catenacci would still face the repercussions of a felony conviction and civil judgment. And because the factual basis for Dr. Catenacci's proposed *Alford* plea will be clear through both the record in this case and the record in the SEC case, there will be no lingering doubt for the public as to the nature of the conduct that was at issue in this case.

## CONCLUSION

For the reasons stated herein, Dr. Catenacci respectfully requests that the Court grant him leave to proceed via an *Alford* plea.

Dated: February 2, 2022

Respectfully submitted,

/s Ronald S. Safer
Ronald S. Safer
Jacob L. Kahn
Georgia N. Alexakis
RILEY SAFER HOLMES & CANCILA LLP
70 W. Madison Street, Suite 2900
Chicago, IL 60602
(312) 471-8700
rsafer@rshc-law.com
jkahn@rshc-law.com
galexakis@rshc-law.com

*Attorneys for Defendant Daniel V.T. Catenacci*

## CERTIFICATE OF SERVICE

I, Ronald S. Safer, certify that on February 2, 2022, I served a copy of the foregoing document electronically using the Court's CM/ECF system, which will automatically generate notice of this filing to all Counsel of Record.

/s/ *Ronald S. Safer*